**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Randy Lee ERWIN,**
**Defendant-Appellant.**

No. 85–3155.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided Nov. 7, 1986.

Mark B. Davis, Anchorage, Alaska, for plaintiff-appellee.

John Murtagh, Walter Share, Anchorage, Alaska, for defendant-appellant.

Before SNEED, KENNEDY and WIGGINS, Circuit Judges.

SNEED, Circuit Judge:

After cocaine and hashish were found in his possession, Randy Lee Erwin pleaded guilty to two counts of possessing narcotics with intent to distribute. Pursuant to Fed.R.Crim.P. 11(a)(2), the plea agreement preserved Erwin's right to appeal the district court's denial of his motion to suppress the evidence. For the reasons stated below, we affirm the district court's decision.

## I.

On May 5, 1985, Trooper Thomas Bowman was on plain-clothes duty at the Anchorage International Airport, where he was observing incoming flights for narcotics couriers. His specific purpose was to look for passengers who conformed to the "drug courier profile" developed by drug enforcement agents or who otherwise exhibited suspicious characteristics.

At approximately 7:00 p.m., Bowman observed passengers disembark from a late-arriving Alaska Airlines flight that had originated in San Francisco with a stopover in Seattle. He estimated that appellant Erwin was the tenth person to leave the plane. Erwin appeared to be traveling by himself and was not initially met by anyone. He was holding an orange day pack. According to Trooper Bowman, Erwin immediately scanned the passenger area in a way that suggested he was searching to see if anyone was watching him. Erwin began to move through the terminal at a very fast pace, weaving in and out and occasionally looking over his shoulders. Bowman followed. At some point, Erwin attracted the attention of Trooper McMillon, another officer assigned to surveillance duties, who also began to follow him.

Erwin took a circuitous route through the terminal, passing the ticket counters and backtracking past the baggage claim area, where he exited without claiming any luggage. Bowman caught up with Erwin in a parking lot, displayed his badge and identification, and explained that he was an Alaska state trooper assigned to the narcotics division.

Bowman asked Erwin if he was willing to answer a few questions, and Erwin replied, "Yes." Upon request, Erwin dis-

played a valid driver's license. At that point, Bowman explained that Erwin was not under arrest and asked him where he had traveled from. Erwin responded that he had come from San Francisco. When Bowman asked to see his plane ticket, Erwin produced a ticket jacket indicating a one-way flight from San Francisco to Anchorage. The name on the ticket matched the name on the driver's license.

At this point, the two were joined by trooper McMillon. McMillon observed a second ticket jacket protruding from Erwin's pocket and asked to see it. Erwin handed it to him. It showed a departure from Anchorage on May 4, with a return booked on May 6. Erwin advised the troopers that his trip had been for the purpose of visiting a sick grandmother. When asked why the trip had been so brief, Erwin replied that he was short on time.

Trooper Bowman then asked Erwin why he had taken a circuitous route through the airport. Erwin replied that he was trying to avoid the airline picketers because his father's girlfriend was one of them and he did not want her to see him flying on Alaska Airlines. Bowman noted that there were no picketers around that day even though Alaska Airlines employees were on strike at the time, and that Erwin's path would have taken him past two of their usual picketing locations. Erwin gave no explanation for his doubling back past the baggage claims area.

Bowman then told Erwin that they were conducting a narcotics investigation for cocaine being brought into Anchorage. Erwin denied having any drugs in his possession, but admitted in response to questioning that he had smoked "a little grass" in the past. The troopers asked him if they could search his day pack, but he refused, stating that he had personal items in the pack that he did not want seen. Bowman then read Erwin his Miranda rights, but assured him that this course of action was routine and did not mean that he was under arrest. Erwin refused to answer any further questions. Trooper Bowman noticed that Erwin had become extremely nervous; his left leg and one of his hands were shaking.

The troopers informed Erwin that they were going to detain his day pack and subject it to a dog-sniff test for drugs. He was told that the test could be completed in a few minutes in the terminal and that he could remain with his day pack if he wished. He was also told that the pack would be returned to him if the dog did not give a positive alert. Erwin said that he did not want to remain with the pack because he had a sick grandmother waiting for him. The troopers pointed out the inconsistency with his previous statement that his sick grandmother was in San Francisco, but Erwin declined to explain. Arrangements were made for the possible return of the pack, and Erwin departed.

The troopers took the pack to their office in the airport terminal and brought in a trained narcotics-detection dog. The dog gave a positive alert to the day pack at approximately 7:45 p.m. A search warrant was obtained from a United States Magistrate at about 11:05 p.m. that night, and a search of the pack conducted 15 minutes later revealed a packet of hashish and two baggies of white powder that reacted positively to a field test for the presence of cocaine.

Erwin was subsequently indicted by a federal grand jury on two counts of possession of cocaine and hashish, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). Prior to trial, Erwin made a motion to suppress the evidence of the narcotics on the ground that the seizure and investigative detention of his day pack at Anchorage Airport violated his Fourth Amendment rights. A suppression hearing was held. Based on the recommendation of the United States Magistrate who listened to the tapes of the hearing, the district court denied Erwin's motion to suppress. Subsequently, as already noted, Erwin entered a conditional plea of guilty to the charges, preserving the right to appeal the district court's ruling.

Erwin does not dispute the fact that the troopers had probable cause supporting

their search of his shoulder pack after the narcotics-detection dog gave a positive alert. Thus, the only issues before us are the propriety of the troopers' initial questioning of Erwin and their subsequent detention of his shoulder pack for the purpose of subjecting it to the dog-sniff test.[1]

## II.

### A. *The Voluntariness of the Initial Questioning*

■ The initial questioning of Erwin poses no Fourth Amendment problems if Erwin consented to the encounter. "[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion); *accord United States v. Patino*, 649 F.2d 724, 727 (9th Cir.1981). In assessing the voluntariness of police-citizen encounters such as the one here, the "essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave." *Patino*, 649 F.2d at 726–27.

Based on the recommendation of the United States Magistrate, the district court determined that the initial encounter between Erwin and the officers was consensual and that a reasonable person in Erwin's position would have considered himself free to leave. These findings can be overturned only if clearly erroneous. *See United States v. Combs*, 762 F.2d 1343,

1349 (9th Cir.1985); *Patino*, 649 F.2d at 727–28 & n. 4.

Review of the record of the suppression hearing demonstrates that the district court's finding of consent was not clearly erroneous. Only troopers Bowman and McMillon testified at the hearing, and their testimony suggests that they requested Erwin's cooperation and that he freely complied. *See* E.R. at 128–30, 157–58 (testimony of Trooper Bowman); *id.* at 167 (testimony of Trooper McMillon). The stop occurred in a public place; the officers displayed no force. Thus the initial questioning of Erwin did not implicate his Fourth Amendment rights.

### B. *Was Probable Cause Necessary To Seize the Day Pack and Subject It to the Dog-Sniff Test?*

■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court elaborated a three-tier structure of Fourth Amendment jurisprudence. The first tier consists of those law enforcement activities, such as police questioning conducted pursuant to valid consent, that do not constitute searches or seizures governed by the Fourth Amendment. The second tier consists of limited intrusions such as pat-downs of the outer clothing (or "frisks") and brief investigative detentions. To justify these "limited" searches and seizures, law enforcement officials must possess a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one. The third tier comprises "full scale" searches or arrests requiring probable cause. *See United States v. Puglisi*, 723 F.2d 779, 783 (11th Cir.1984).

---

1. Erwin also argues on appeal that the evidence should have been suppressed under Alaska law, notwithstanding federal standards. Erwin did not, however, adequately preserve this issue for appeal. He did not raise the issue either in his memoranda in support of his motion to suppress or at the suppression hearing: his attorney focused solely on federal law. Moreover, even though Magistrate Roberts raised the issue *sua sponte* in his recommendations and counseled against application of Alaska law, *see* E.R.

at 59–61, Erwin did not challenge this determination in his formal objections to those recommendations, *see* E.R. at 63–70.

Under Fed.R.Crim.P. 12(b)(3), a defendant must raise his defenses and objections relating to the suppression of evidence in a pretrial motion. If a defendant fails to do so, those defenses and objections are waived. *See* Fed.R. Crim.P. 12(f). Because Erwin has not shown good cause for his omission, *see id.*, we decline to consider the issue.

Clearly, the seizure of Erwin's day pack was not consensual: although the troopers informed Erwin that he was free to leave the airport, they made it just as clear that they would not let him take his pack. This was a seizure of the pack. The question remains whether the seizure's constitutionality required only reasonable suspicion or full-blown probable cause.

The Supreme Court dealt with the issues of dog-sniffs and luggage seizures in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). The decision in this case turns largely on whether the officers followed *Place*'s instructions. *Place* contains several observations pertinent to this case. First, the Court held that subjecting luggage to a sniff test by a trained drug-detection canine is not a "search" within the meaning of the Fourth Amendment. *Id.* at 707, 103 S.Ct. at 2644. Such a procedure, the Court reasoned, does not greatly impair legitimate privacy interests because the only information obtained is whether the luggage contains contraband and that information is gleaned in a relatively unintrusive manner. *Id.; see United States v. Beale*, 736 F.2d 1289, 1291 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

The Court acknowledged, however, that a "seizure of personal luggage from ... the traveler's immediate possession ... intrudes on both the suspect's possessory interest in his luggage as well as his liberty interest in proceeding with his itinerary." 462 U.S. at 708, 103 S.Ct. at 2645. Consequently, the Court held that, "when the police seize luggage from the suspect's custody, ... the limitations applicable to investigative detentions of the person should define the permissible scope of an investigative detention of the person's luggage on less than probable cause." *Id.* at 708–09, 103 S.Ct. at 2645.

Without providing an exhaustive list of criteria, the Court mentioned a few facts germane to determining whether the limitations defining a *Terry* stop have been exceeded. First, the Court indicated the importance of the *length* of the detention.

Although it declined to adopt the ALI's recommendation of a 20–minute maximum, it held that the 90–minute detention of Place's luggage was excessive. *See id.* at 709–10 & n. 10, 103 S.Ct. at 2645, 2646 & n. 10. In assessing the effect of the length of a detention, the Court stressed, courts should take into account "whether the police diligently pursue[d] their investigation" and thereby minimized any intrusion on the traveler's Fourth Amendment rights. *Id.* at 709, 103 S.Ct. at 2645. The Court also emphasized that law enforcement officials should inform the traveler "of the place to which they are transporting his luggage" and "the length of time he might be dispossessed," and make arrangements "for return of the luggage if the investigation dispel[s] the suspicion." *Id.* at 710, 103 S.Ct. at 2646.

Troopers Bowman and McMillon abided by the guidelines laid down in *Place*. They informed Erwin of the reason his pack was being seized and the procedure they planned to follow. Moreover, they assured him that the sniff test would be brief and gave him the option of observing it. When he declined, they made arrangements for the possible return of the pack. Finally, although Erwin stepped off his plane at about 7:00 p.m. and the dog alerted in response to his pack at about 7:45 p.m., Erwin conceded in his memoranda before the lower court that the interval between the seizure of his pack and the dog-sniff test was in fact "very short." Under these circumstances, we hold that the seizure of Erwin's day pack required only reasonable suspicion, not probable cause.

C. *Did the Troopers Possess Reasonable, Articulable Suspicion?*

Whether reasonable suspicion exists in a particular case is a mixed question of fact and law. The findings with respect to the historical facts are reviewed under the "clearly erroneous" standard of Fed.R. Civ.P. 52(a). *See United States v. McConney*, 728 F.2d 1195, 1200–01 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). The ultimate

conclusion, however, is subject to de novo review. *See United States v. Maybusher,* 735 F.2d 366, 371 n. 1 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985).

There is no "litmus test" for reasonable suspicion. Each instance of police conduct must be judged for reasonableness "in light of the particular circumstances." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Erwin argues that the district court relied for its decision solely on his conformity with the drug courier profile. It is clear, however, that this was not the case. The magistrate specifically stated that

> [t]he resemblance of facts to the profile does not determine the constitutional validity of a search. All of the facts and circumstances surrounding the detention of the day pack and its subjection to the police dog must be considered as a whole to determine whether the seizure of the day pack was based on reasonable suspicion regardless of any characterization of the facts as "drug carrier characteristics."

E.R. at 50–51. Thus, we are not faced with the question of whether some particular degree of conformity to the drug courier profile automatically furnishes reasonable suspicion. We need only decide whether, based on the specific facts of this case, the troopers possessed reasonable, articulable suspicion.

We hold that they did. The troopers cited, and the magistrate found, the following facts as bases for their suspicion:

(1) Erwin had just arrived from San Francisco, a known drug-source city.

(2) Immediately upon deplaning, Erwin scanned the passenger area in a manner suggesting that he was watching for surveillance.

(3) Erwin took a circuitous route through the terminal—which he did not adequately explain—and exited without picking up any baggage.

(4) Erwin walked at an exceedingly fast pace, weaving in and out of other people even though he appeared not to be trying to make a connecting flight.

(5) Erwin continually looked back over his shoulders while walking.

(6) Erwin was carrying a day pack, which he clutched tightly.

(7) Erwin had made a virtual turnaround flight to San Francisco and back, traveling over 4,000 miles in two days.

(8) Erwin had purchased two tickets for return flights booked on different days.

(9) Erwin became extremely nervous when advised by the officers that they were investigating the transportation of cocaine.

(10) Erwin gave contradictory statements about needing to visit a sick grandmother.

(11) Erwin admitted that he had, at some undisclosed time in the past, smoked a small amount of marijuana.

*See* E.R. at 54–55.

It may be that none of these facts alone would spark reasonable suspicion. This was the position taken by the magistrate. Certain of them, moreover, should have been subtracted from the calculation.[2]

**2.** Fact # 10 may not be considered because the contradiction as to the whereabouts of Erwin's "sick grandmother" came out only *after* the troopers informed Erwin that they intended to seize his day pack. Because the seizure occurred for legal purposes not when the officers actually obtained physical possession of the pack, but when they announced their intention to do so, *see United States v. Allen,* 644 F.2d 749, 751 n. 4 (9th Cir.1980), Erwin's subsequent contradictory statement cannot form part of the basis for reasonable suspicion. Fact # 11 also should be ignored because Erwin's admission that he had smoked a small amount of marijuana at some undisclosed time bears no reason-

able relationship to the question of whether he was then engaged in the unlawful transportation of narcotics.

Finally, Fact # 9—Erwin's physical agitation after being read his *Miranda* rights—is of questionable admissibility in this determination. Although the magistrate found that Erwin's initial responses were voluntary, he did not consider the continuing voluntariness of the encounter as the troopers' questioning went on. In particular, he did not consider whether, after the troopers' reading of the *Miranda* warnings (despite their statement that Erwin was not under arrest), a reasonable person in Erwin's position

We are satisfied, however, that the remaining facts, taken collectively, established the degree of suspicion requisite to a brief detention of Erwin's shoulder pack.

This case is not controlled by *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). There the Supreme Court held that drug enforcement agents' reasonable suspicion could not rest solely on factors that, although in conformity with the drug courier profile, "describe a very large category of presumably innocent travelers." *Id.* at 441, 100 S.Ct. at 2754. The Court found that the particularized evidence of wrongdoing in *Reid* was insufficient to support a *Terry* seizure. *Id.* As other circuits have recognized, however, *Reid* does not preclude all reliance on courier profile characteristics; it simply indicates that the most general of those characteristics cannot support a *Terry* stop without more particularized evidence of suspicious activity. *See, e.g., United States v. Berry,* 670 F.2d 583, 599–601 (5th Cir. Unit B 1982) (en banc); *United States v. Corbin,* 662 F.2d 1066, 1069 (4th Cir. 1981). In *Reid,* the only particularized evidence was the defendant's apparent effort to conceal the fact that he was traveling with another person. *See* 448 U.S. at 441, 100 S.Ct. at 2754. In the instant case, the officers had considerably more to go on.

■ Erwin appeared nervous and furtive both when disembarking and when walking through the airport. He was "clutching" his shoulder pack, "moving very fast," and glancing repeatedly over his shoulders. E.R. at 44. In addition, Erwin took a roundabout route through the airport despite having no luggage to claim, or so far as it appeared, any other business to attend to. When questioned on this point, he gave an explanation that may not have been inherently unbelievable, but was at least not in conformity with all the facts known to the officers. Nor did that explanation account for Erwin's backtracking along the route he had taken. Thus, the particularized evidence of Erwin's nervousness, unusual behavior, and possible effort to conceal the truth was sufficient to permit reference to his profile characteristics—traveling to a drug-source city for one day, carrying only a shoulder pack, returning on a different flight from that on which he was reserved—generally suggestive of a drug courier. Together, the two forms of evidence provided the state troopers with a reasonable suspicion that Erwin was carrying narcotics. Other circuits have found reasonable suspicion on similar or less incriminating facts. *See, e.g., United States v. Moya,* 704 F.2d 337, 343 (7th Cir.) *vacated on other grounds,* 464 U.S. 979, 104 S.Ct. 418, 78 L.Ed.2d 355 (1983); *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 342 (2d Cir.1982); *United States v. Sanford,* 658 F.2d 342, 345 (5th Cir. Unit B Oct. 1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982).

The district court's decision is therefore AFFIRMED.

WIGGINS, Circuit Judge, dissenting.

I agree with the majority that the Alaska state troopers needed articulable and reasonable suspicion to seize Erwin's day pack and that we determine reasonable suspicion from the specific circumstances. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). However, hindsight is not the measure of reasonable suspicion. The troopers guessed right about Erwin, but based their suspicion on drug courier profile characteristics so sweeping as to ensnare the innocent as well as the guilty. As I believe *Reid v. Georgia,* 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), dictates a contrary result, I respectfully dissent.

In *Reid,* the government agent suspected Reid carried drugs because Reid: (1) departed from a cocaine-source city, (2) arrived in the early morning when law en-

would still have believed himself free to leave. *See United States v. Lara,* 638 F.2d 892, 898 n. 10 (5th Cir. Unit B Mar. 1981) ("Giving *Miranda* warnings ... may very well elevate [a nondeten-tion] encounter to a seizure within the meaning of *Terry*"). We need not and do not decide whether in fact Erwin was seized when the troopers read him the *Miranda* warnings.

forcement activity is low, (3) traveled with only his shoulder bags, and (4) appeared to conceal that he was traveling with a companion by walking in front of him and occasionally glancing back at him. *Id.* at 441, 100 S.Ct. at 2754. The Court held that the first three facts were not sufficient to create reasonable suspicion, for if it were to conclude otherwise "a very large category of presumably innocent travelers would be subject ... to virtually random seizures." *Id.* Further, the agent's belief that Reid and his companion were concealing that they were traveling together was a mere hunch, not a ground for reasonable suspicion. *Id.*

Like Reid, Erwin departed from a drug-source city. He carried a day pack, which he clutched tightly, and appeared not to have luggage. As in *Reid,* these general characteristics describe a large group of innocent travelers. Most planes arriving in Anchorage depart from drug-source cities. Many people travel with only a day pack; the Court in *Reid* found little reason for suspicion from that fact. *Id.* While Erwin made a two-day turnaround from Anchorage, such a turnaround is not particularly fast and can be explained by a number of legitimate business or personal reasons; indeed, Erwin gave a satisfactory explanation.

Upon deplaning, Erwin scanned the passenger area. He walked quickly through the airport, looking over his shoulder. The majority asserts, without support in the record, that his conduct suggests he was nervous. Neither the troopers nor the magistrate ever claimed Erwin was nervous before the troopers questioned him.[1] It is plausible that Erwin, like many passengers arriving on a flight that was one-

hour late, scanned the passenger area to see if friends were waiting to meet him, walked fast to meet them, and glanced over his shoulder to make sure he did not miss them. In fact, a friend was waiting to pick Erwin up. Erwin's conduct describes that of a large group of innocent travelers.

Erwin took a roundabout route through the airport, and when questioned explained he was trying to avoid strikers even though no pickets were present that day. The majority relies heavily on these facts as particularized evidence of suspicious activity. Erwin's explanation was plausible; there was an ongoing strike at the airport and Erwin had no reason to know the strikers were not picketing when he deplaned. The troopers' doubt about his explanation was more an " 'inchoate and unparticularized suspicion or "hunch" ' ... than a fair inference in the light of [their] experience." *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883). Their doubt is too weak a foundation to support seizing Erwin's pack.

The cases the majority relies upon found reasonable suspicion under circumstances involving far more incriminating conduct by the defendant, such as the use of an alias or other misrepresentation. *See United States v. Moya,* 704 F.2d 337, 342–43 (7th Cir.) (defendant first denied having identification, then later showed identification, and denied existence of plastic bag in plain view), *vacated on other grounds,* 464 U.S. 979, 104 S.Ct. 418, 78 L.Ed.2d 355 (1983); *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 342 (2d Cir.1982) (defendant used alias); *United States v. Sanford,* 658 F.2d 342, 345 (5th Cir. Unit B Oct. 1981) (defendant left false call-back number with airline), *cert. denied,* 455 U.S.

---

**1.** The troopers observed Erwin become nervous only *after* they advised him that they were investigating him for cocaine trafficking and read him his *Miranda* rights. I agree with the majority that Erwin's initial encounter with the troopers was consensual. As the majority notes, however, if the troopers subjected Erwin to a *Terry* stop when they read him his rights, the magistrate erred in relying on Erwin's subsequent nervousness. *See supra* p. 1510 note 2. While the majority does not decide whether

Erwin was subjected to a *Terry* stop when the troopers read him his rights, *id.,* I believe that he was, for he could no longer have reasonably felt free to leave. *See United States v. Lara,* 638 F.2d 892, 898 n. 10 (5th Cir. Unit B Mar. 1981) (dictum). As the troopers needed reasonable suspicion to subject him to the stop, his subsequent nervousness resulting from the stop could not furnish further ground for reasonable suspicion for seizing the pack.

991, 102 S.Ct. 1618, 71 L.Ed.2d 852 (1982); *see also Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (defendant used alias). The absence of any clear incriminating conduct by Erwin distinguishes this case from those the majority cites.

I acknowledge that the troopers were experienced narcotics agents who might perceive things the untrained eye would overlook, *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (plurality), and that the government has a compelling interest in stemming the drug traffic, *Florida v. Royer,* 460 U.S. at 508, 103 S.Ct. at 1329 (Powell, J., concurring). However, we walk a fine line between rewarding good police judgment and authorizing arbitrary government action. I believe that line was crossed here.