**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Andrew SOKOLOW, Defendant-Appellant.**

**No. 85–1021.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1985.

Remanded for Additional Findings July 31, 1986.

Resubmitted Oct. 31, 1986.

Decided Jan. 28, 1987.

As Amended March 10, 1987.

Robert P. Goldberg, Honolulu, Hawaii, for defendant-appellant.

Michael A. Santoki, Honolulu, Hawaii, for plaintiff-appellee.

Before FERGUSON, NORRIS and WIGGINS, Circuit Judges.

NORRIS, Circuit Judge:

Andrew Sokolow appeals his conviction for possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Sokolow entered a conditional guilty plea under Fed.R.Crim.P. 11(a)(2), thereby reserving the right to appeal the district court's denial of his motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment. The Fourth Amendment challenges are based on Sokolow's detention at the Honolulu airport and the search of his carry-on luggage subsequent to a dog alert for narcotics. We have jurisdiction under 28 U.S.C. § 1291, reverse the district court's denial of the motion to suppress, and remand.

## FACTS

On Sunday, July 22, 1984, Sokolow purchased two round trip tickets to Miami at the United Airlines counter at Honolulu Airport. Sokolow paid for the $2100 tickets out of a large wad of $20 bills, purchasing them under the names of Andrew Kray and Janet Norian. The ticket agent notified drug task force agent John McCarthy of the purchase. Agent McCarthy called the telephone number given to the ticket agent by Sokolow. The call was answered by a recorded message on an answering machine. Upon listening to a tape of this message, the ticket agent identified the voice as that of Sokolow. Agent McCarthy determined that the number was subscribed to by Karl Herman at 348–A Royal Hawaiian Ave., Honolulu, Hawaii. What Agent McCarthy apparently did not know

at that time was that both Herman and Sokolow lived at this address. On July 24, Agent McCarthy learned that Sokolow was scheduled to return to Honolulu the following day with a female companion, Janet Norian. On July 25, agents at the Los Angeles airport confirmed that Sokolow and Norian were aboard the flight to Honolulu. Sokolow was wearing a black jumpsuit and a large amount of gold jewelry.

Traveling with carry-on luggage only, Sokolow and Norian arrived at Honolulu airport and proceeded directly to the street to hail a taxi. They were at the curbside waiting for a taxi when several Drug Enforcement Administration (DEA) agents approached them. As found by the district court, the agents grabbed Sokolow by the arm, pulled him onto the walkway, and sat him down. Agent Kempshall then asked Sokolow for his airline ticket and identification. Sokolow responded that he was not carrying any identification and did not have his airline ticket. Sokolow further stated that, although his name was Sokolow, he was using his mother's maiden name of Kray, and that he had not made the reservations himself. Sokolow, Norian, and their luggage were then taken to a DEA office in the airport.

In the DEA office, the luggage was turned over to a Customs Service dog handler for examination by a narcotics detector dog. The narcotics detection dog alerted to a brown shoulder bag. Based on this information, the agents placed Sokolow under arrest and proceeded to secure a warrant to search the shoulder bag. Although the search uncovered no drugs, it did uncover certain papers that prompted the agents to have the narcotics detection dog reexamine the remaining three pieces of luggage. This time the dog alerted to a medium sized carry-on bag. Ultimately, another narcotics detection dog confirmed this alert. The agents searched the medium-sized bag pur-

suant to a warrant and found 1,000 grams of cocaine.

Sokolow was indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The district court denied his motion to suppress all statements and evidence secured pursuant to his seizure, his arrest, and the search of his luggage. Sokolow entered a conditional guilty plea thereby preserving his right to challenge the district judge's ruling on his Fourth Amendment claims. Concluding that reversal was a possibility because the case was a "close one," the district judge granted Sokolow bail pending appeal.

### DISCUSSION

The disposition of this case turns on two key questions:[1] (1) at what point did the agents seize Sokolow?; and (2) at the moment of seizure, did the agents have information supporting a reasonable and articulable suspicion that Sokolow was engaged in criminal activity? We conclude that Sokolow was seized when he was grabbed by the arm and sat down at the curbside. This was before any questioning began. We also conclude that at the time they seized Sokolow, the agents did not have a basis for a reasonable and articulable suspicion that Sokolow was engaged in criminal activity. As a consequence, the seizure violated the Fourth Amendment, and all the subsequent evidence uncovered must be suppressed.

Without making any specific findings of fact, the district court originally ruled that the initial contact between the agents and Sokolow at curbside did not rise to the level of a seizure, citing *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) for the proposition that "[t]here is no Constitutional infringement when an officer merely approaches and speaks to an individual in a public place."

---

**1.** Sokolow also argues (1) that the investigatory detention of him ripened into an arrest unsupported by probable cause when he was moved to the DEA office and (2) that the detention without probable cause of the three pieces of luggage the narcotics dog did not alert to ex-

ceeded the permissible limits of an investigatory detention. Although these arguments raise interesting and complex issues, we need not address them because we conclude that the initial seizure of Sokolow was unconstitutional.

However, this ruling has since been cast into considerable doubt by the district court's findings on remand,[2] which belie the apparent assumption that this case involved nothing more than agents approaching and speaking to a suspect in a consensual manner. The district court accepted on remand defendant's contention that the agents grabbed Sokolow by the arm and moved him back to a seat before they asked him questions. Although the "federal agents do not remember the event in the same way," the district court found that the government had not met its burden of proof on the issue. Moreover, the district court also found on remand that "[a]t the initial curbside stop, Sokolow did reasonably believe he was *not* free to leave." (emphasis added). Unfortunately, the court was ambiguous about whether it was merely finding that Sokolow held this reasonable belief after being questioned and told his luggage would be detained or whether it was also finding that Sokolow had this reasonable belief before the questioning. If the latter, then there can be no doubt that Sokolow was seized before the curbside questioning began. *See INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (a person has been seized if under the circumstances a reasonable person would have believed he was not free to leave); *United States v. Patino,* 649 F.2d 724, 727–28 (9th Cir.1981) (same). But even absent a specific finding that Sokolow reasonably believed he was not free to leave at the moment he was physically grabbed, we hold that Sokolow was seized at that moment.

■■■ We review the district court's determination as to whether a seizure occurred de novo. *See LaDuke v. Nelson,* 762 F.2d 1318, 1327 (9th Cir.1985). Although we certainly have no quarrel with the proposition that police do not seize a person within the meaning of the Fourth Amendment by merely approaching him and asking him questions in public, we think it clear that the initial curbside contact in this case did not involve such a consensual encounter. Physically grabbing, moving, and seating a suspect to ask questions, even in public, clearly restrains that suspect's liberty in a nonvoluntary way. Indeed, the use of physical means to restrain a person's movement is the most obvious form of seizure. *See e.g., Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *Patino,* 649 F.2d at 728 (stating that physical restraint is the "most obvious" form of seizure). Thus we hold that Sokolow was seized at the point he was grabbed and seated, and before any questioning began.

■■■ Although not all seizures require probable cause, "any curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1980) (per curiam). We review the district court's conclusion that a reasonable suspicion existed de novo.[3] *United States v. Sutton,* 794 F.2d 1415, 1425 (9th Cir.1986); *United States v. Maybusher,* 735 F.2d 366, 371 & n. 1 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). Although the issue is a close one, we conclude that a reasonable and articulable suspicion did not exist at the time the agents grabbed Sokolow by the arm and sat him down.[4]

■■■ The district court based its conclusion that the initial curbside stop was supported by a founded suspicion in part on the facts that Sokolow admitted he was not

---

2. After argument, we vacated submission and remanded to the district court for additional findings of fact on specified issues.

3. We accept as not clearly erroneous the findings of fact upon which the district court based its conclusion that reasonable suspicion existed.

4. The government has not argued on appeal that a reasonable suspicion existed at the time they first began questioning Sokolow, contenting itself with arguing that the initial contact was not a seizure at all.

traveling under his real name and that he told the agents he did not have his ticket even though he had just gotten off the plane. We disagree. The initial seizure, which we hold occurred when the agents first grabbed Sokolow, must be based upon a reasonable and articulable suspicion that existed at that time. It cannot be based on information that is a fruit of the seizure itself.[5] *See United States v. Erwin*, 803 F.2d 1505, 1510 n. 2 (9th Cir.1986).

The agents knew only the following facts matching their "drug courier profile" when they first approached Sokolow: (1) that Sokolow had just returned from a three-day trip to Miami, a well-known source city for drugs; (2) that Sokolow had paid for his tickets out of a large wad of $20 bills; (3) that neither Sokolow nor Norian checked any luggage; (4) that Sokolow changed planes en route to Hawaii; (5) that Sokolow dressed in a black jumpsuit and wore a lot of gold jewelry; and (6) that Sokolow had his voice on an answering machine at a phone subscribed to by Karl Herman but told the airline his name was Andrew Kray. The agents did not know at the time of seizure that the defendant's true name was Sokolow.[6]

■ Facts (5) and (6) are not permissible grounds for formulating a reasonable suspicion. We fail to see what could possibly be suspicious about wearing a black jumpsuit and gold jewelry. We think it is not consistent with the Fourth Amendment for the police to interfere with a person's liberty because of the way he dresses absent some indication that the particular dress bears some logical connection to the suspected criminal activity. Style of clothing, as an indicator of life-style, is an extremely unreliable ground for suspecting ongoing criminal activity. *Cf. Erwin*, 803

F.2d at 1511 n. 2 (admission that suspect "had smoked a small amount of marijuana at some undisclosed time bears no reasonable relationship to the question of whether he was then engaged in the unlawful transportation of narcotics."). No one could object if the police thought there was something suspicious about a person leaving a bank wearing a stocking over his face. But the police can not act based upon sociological assumptions that people dressed in a particular way are prone to commit crimes. Not only is a person's fashion taste of no relevance to the likelihood that he or she is presently engaging in criminal activity, but basing police action upon such matters of personal taste and style is offensive and implicates concerns about freedom of individual expression. Certainly no one can doubt that the police can not, even in part, justify an investigatory stop of a person suspected of insider trading because that person wears a pin-striped suit and a gold Cartier watch.

■ Nor does the fact that Sokolow's voice was on an answering machine for a phone listed under the name of his roommate Karl Herman provide a basis for suspicion. In contemporary society it is not unusual for persons with different last names to share a common residence and telephone. Nor is it unusual for a member of the household to dictate prerecorded messages on the answering machine even though his or her name is not listed with the phone company as the subscriber. Thus the fact that a discrepancy existed between the name Sokolow gave the airline and the name under which his phone was listed is not a suspicious circumstance. It was only when Sokolow stated that his true name was Sokolow but that he was traveling under his mother's maiden name of Kray that the agents had a valid reason to believe that Sokolow was traveling under an as-

---

5. Likewise, Sokolow's statements during the curbside questioning cannot be used to support a reasonable suspicion to detain his luggage. Because these statements were the fruit of the illegal seizure of Sokolow, and because we hold that, absent those statements, no reasonable suspicion existed to detain the luggage for a dog sniff, the evidence discovered in that luggage was a fruit of the illegal seizure of Sokolow and must be suppressed.

6. On remand, the district court also noted that a report indicated Sokolow was acting "in a suspicious manner" during his layover in Los Angeles. However, this allegedly suspicious activity is not mentioned, relied upon, or described in any other findings of the court or the magistrate. We decline to give any weight to a generalized conclusion that a report indicated a suspect acted "suspicious" without any further detail.

sumed name. That, however, occurred *after* the seizure. Thus the agent's belief before the seizure that Sokolow was traveling under a false name was unwarranted and cannot be used as a ground for reasonable suspicion justifying the seizure.

■ The only remaining grounds for the seizure were that Sokolow had taken only carry-on bags on a three-day trip to Miami, changing planes on the way back and buying his tickets in cash. These facts can be broken down into two types: those that clearly "describe a very large category of presumably innocent travelers" and those that arguably relate to the "particular conduct" of the defendant. *Reid,* 448 U.S. at 441, 100 S.Ct. at 2754; *see also Erwin,* 803 F.2d at 1511. Under *Reid,* "the most general of [courier profile] characteristics cannot support a *Terry* stop without more particularized evidence of suspicious activity." *See Erwin,* 803 F.2d at 1511. The *Reid* Court described the following facts as too general to support a *Terry* stop alone: arriving from a known source city for cocaine at early morning when law enforcement activity is low with only carry-on luggage. *See* 448 U.S. at 441, 100 S.Ct. at 2754. We conclude that arriving on a connecting flight from a three-day trip to Miami with only carry-on luggage—facts (1), (3) & (4)—are also the type of general characteristics shared by a large category of innocent travelers that cannot support a *Terry* stop absent particularized evidence of criminal activity. Indeed, they probably encompass most travelers taking short trips to Miami from Honolulu since such travelers are likely to take only carry-on luggage with them for a short trip and probably cannot easily get a direct flight all the way from Miami to Honolulu.

■ The only fact remaining is that Sokolow paid for his tickets out of a large wad of cash. Although close, we do not consider this evidence alone to be particularized evidence of suspicious activity. Particularized evidence must raise suspicions of *ongoing* (or recently completed) criminal activity. *See Reid,* 448 U.S. at 440, 100 S.Ct. at 2753 (must have reasonable "suspicion that the person seized *is* engaged in criminal activity." (emphasis

added)); *Erwin,* 803 F.2d at 1510 n. 2 (rejecting one fact as a basis for reasonable suspicion because it bore no reasonable relationship to the question of whether the suspect "was *then engaged* in the unlawful transportation of narcotics." (emphasis added)). Sokolow's payment in cash is quite unlike a suspect's looking around to see if he was being watched, appearing nervous, taking evasive action, or using an alias while traveling, all of which at least tend to raise a suspicion that criminal activity is going on *at that time. See, e.g., Florida v. Rodriguez,* 469 U.S. 1, 6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (evasive action); *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (used alias); *Terry,* 392 U.S. at 6, 88 S.Ct. at 1872 (casing store); *Erwin,* 803 F.2d at 1511 (looked over shoulder, appeared nervous, took evasive action); *see also United States v. Greene,* 783 F.2d 1364, 1366 (9th Cir.1986) (tip regarding crime). The suggested inference that payment in cash for airplane tickets alone is suspicious seems to be that people who pay in cash are more likely to be criminals and thus more likely to be engaging in criminal activity at any given moment. Such an inference from payment of cash for airplane tickets alone strikes us as too attenuated to justify a Fourth Amendment seizure. We thus decline to penalize the use of legal tender in buying airplane tickets.

But even if we did consider cash payment for airplane tickets to be particularized evidence of suspicious activity, it would not be sufficient to justify a forcible detention. In *Reid,* the Supreme Court held that a *Terry* stop was unjustified where "the only particularized evidence was the defendant's apparent effort to conceal the fact that he was traveling with another person. *See* 448 U.S. at 441, 100 S.Ct. at 2754." *Erwin,* 803 F.2d at 1511. Sokolow's payment for his tickets in cash is certainly no more suspicious than a suspect's attempts to conceal the identity of his traveling companion.

In conclusion, we hold that Sokolow was seized at the moment he was grabbed by the agents, and that at the time of this

seizure the agents did not have a reasonable and articulable suspicion. Because this seizure thus violated the Fourth Amendment, all evidence acquired after the curbside seizure must be suppressed. We therefore reverse the district court's denial of Sokolow's motion to suppress and remand this case to the district court with instructions that Sokolow be permitted to withdraw his guilty plea. *See* Fed.R. Crim.P. 11(a)(2).

REVERSED AND REMANDED.

WIGGINS, Circuit Judge, dissenting:

If the present opinion becomes the law of this circuit, I conclude that many, and perhaps all, *Terry* stops that rely upon drug courier profile characteristics may fail on constitutional grounds. Because I believe such an unfortunate result is not mandated by the law, I respectfully dissent.

Under a limited exception to the general fourth amendment rule that seizure of a person requires probable cause to arrest, an agent may justifiably detain a person if the agent is aware of specific and articulable facts creating a reasonable suspicion that the person has committed or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). One important law enforcement tool developed by the Drug Enforcement Administration to aid in the detection of drug traffickers is the so-called "drug courier profile". The profile involves a number of characteristics, all of which, both singly and collectively, are in themselves lawful. Because conformance with some aspects of the profile could "describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures," *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980), the particular facts in each case must support a reasonable suspicion of criminal activity before a *Terry* stop is justified, *id.*

In this case, the question is whether the agents possessed reasonable and articulable suspicion that Sokolow was engaged in narcotics trafficking. First, the evidence discloses that Sokolow paid $2100 for his tickets from a stack of twenty dollar bills approximately double that amount. Although the question is close, I agree with the court that standing alone this evidence is not enough to support a valid *Terry* stop. However, such activity is sufficiently suspicious that the addition of few other relatively anomalous characteristics could support a founded suspicion of illegal activity. Innocent persons do not characteristically carry thousands of dollars in twenty dollar bills on their persons, and narcotics agents would be unlikely to ensnare a "large category of presumably innocent" persons, *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754, if this characteristic were accorded substantial weight. I do not understand the court's contention that carrying such a wad of bills is not evidence of "ongoing" criminal activity, while "appearing nervous, or taking evasive action" is such evidence. People may be nervous for a variety of reasons, one of which is that they are engaged in illegal activity. People may also carry large amounts of cash for a variety of reasons, for example, to conceal illicit travel patterns, or to buy drugs.

Despite the majority's assertion, the agents did not rely *alone* on the cash payment to the airline. They also traced Sokolow's travel pattern. He flew from Honolulu to Miami, a known drug source city, on July 22, and returned on July 25, a very short time when one considers it takes a minimum of ten hours to travel each way. He carried only carry-on luggage. These relatively anomalous characteristics serve to enhance the suspicious circumstances of the large cash purchase of the tickets. In *United States v. Erwin*, 803 F.2d 1505, 1511 (9th Cir.1986), this court concluded that arrival from a drug source city after a one day stay with only carry-on luggage required further particularized evidence to establish founded suspicion. The *Erwin* court concluded that defendant's nervous behaviour, circuitous route through the airport and possible effort to conceal the truth fulfilled the requirement of particularized evidence. I submit that this defendant's

payment of his airline ticket with thousands of dollars in twenty dollar bills coupled with his general travel pattern and behavior are more objectively suspicious than the facts on which the *Erwin* court relied.[1]

The majority has decided there was not reasonable suspicion for a *Terry* stop by looking at each evidentiary factor discretely. We should view the whole mosaic rather than each tile. *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 342 (2nd Cir.1982). Defendant's conduct established a reasonable suspicion of narcotics trafficking sufficient to warrant a valid investigative stop.

---

1. The *Erwin* court relied heavily on defendant's use of an allegedly circuitous route through the airport to distinguish itself from *Reid* where defendant's arrival in the early morning from a drug source city without checked luggage was held to be too generalized to constitutionally warrant a *Terry* stop. I dissented in *Erwin* because I disagreed with the majority that a circuitous route and possibly implausible expla- nation were sufficient facts to distinguish *Erwin* from *Reid,* and because I believed the record did not support the court's conclusion that the defendant was "nervous" before he was detained. I take the opposite view here because I believe the agents' suspicions were reasonably backed by specific facts that would not apply wholesale to innocent persons. *Erwin,* 803 F.2d at 1511–13 (Wiggins, J., dissenting).