**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Andrew SOKOLOW,
Defendant–Appellant.**

No. 85–1021.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1985.

Remanded for Additional Findings,
July 31, 1986.

Resubmitted Oct. 31, 1986.

Decided Jan. 28, 1987.

Amended March 10, 1987.

Second Amended Opinion Filed
Nov. 4, 1987.

1414

Robert P. Goldberg, Honolulu, Hawaii, for defendant-appellant.

Michael A. Santoki, Honolulu, Hawaii, for plaintiff-appellee.

Before FERGUSON, NORRIS and WIGGINS, Circuit Judges.

## SECOND AMENDED OPINION

FERGUSON, Circuit Judge:

On appeal from his conviction for possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1), Andrew Sokolow challenges the district court's ruling denying his motion to suppress evidence obtained during the retention of himself and his luggage at the Honolulu airport. The evidence he moved to suppress included 1,000 grams of cocaine. Exercising appellate jurisdiction under 28 U.S.C. § 1291, we initially reversed his conviction on the ground that agents of the Drug Enforcement Agency had violated the Fourth Amendment in detaining Sokolow and searching his luggage. 808 F.2d 1366 (9th Cir.1987). On petition for rehearing, the government draws our attention to additional evidence that it believes should change our original conclusion that the Fourth Amendment had been violated. We disagree, and thus deny the government's petition for rehearing, vacate our previous disposition, and file this amended opinion.

### I.

On Sunday, July 22, 1984, Sokolow purchased two roundtrip tickets to Miami at the United Airlines counter at Honolulu Airport. Sokolow paid for the $2100 tickets in cash with approximately half of a large wad of $20 bills he was carrying, purchasing them under the names of Andrew Kray and Janet Norian. The ticket agent notified drug task force agent John McCarthy of the purchase. Agent McCarthy called the telephone number given to the ticket agent by Sokolow. The call was answered by a recorded message on an answering machine. Upon listening to a tape of this message, the ticket agent identified the voice as that of Sokolow. Agent McCarthy determined that the number was subscribed to by Karl Herman at 348–A Royal Hawaiian Avenue, Honolulu, Hawaii. What Agent McCarthy apparently did not know at this time was that both Herman and Sokolow lived at this address. On July 24, Agent McCarthy learned that Sokolow and Janet Norian were scheduled to return to Honolulu the following day on a flight with a layover in Los Angeles. On July 25, agents at the Los Angeles airport reported that during his layover Sokolow "appeared to be very nervous and was looking all around the waiting area"[1] and that Sokolow and Norian had boarded the flight to Honolulu. Sokolow was wearing a black jumpsuit and a large amount of gold jewelry.

Traveling with carry-on luggage only, Sokolow and Norian arrived at Honolulu airport and proceeded directly to the street to hail a taxi. They were at curbside waiting for a taxi when, at approximately 6:41 p.m., several Drug Enforcement Administration (DEA) agents approached them. As found by the district court, the agents grabbed Sokolow by the arm, pulled him onto the walkway, and sat him down. Agent Kempshall then asked Sokolow for his airline ticket and identification. Sokolow responded that he was not carrying any identification and did not have his airline ticket. Sokolow further stated that, although his name was Sokolow, he was using his mother's maiden name of Kray, and that he had not made the reservations himself. Sokolow, Norian, and their lug-

---

1. Transcript of Remand Hearing of September 22, 1986, at 20, 36, 67. The testimony that the Los Angeles agents made this report to the Honolulu agents was adduced during an evidentiary hearing conducted by the district judge in response to our limited remand for additional findings of fact on specified issues. The district judge's supplemental findings of fact and conclusions of law were forwarded to this court, but the reporter's transcript of the evidentiary hearing was not made part of the appellate record until the government filed its petition for rehearing.

gage were then taken to a DEA office in the airport.

In the DEA office, the luggage was turned over to a Customs Service dog handler for examination by a narcotics detector dog. The narcotics detection dog alerted to a brown shoulder bag. Based on this information, the agents placed Sokolow under arrest and proceeded to secure a warrant to search the shoulder bag. Although the search uncovered no drugs, it did uncover certain papers that prompted the agents to have the narcotics detection dog reexamine the remaining three pieces of luggage. This time the dog alerted to a medium-sized carry-on bag. Ultimately, another narcotics detection dog confirmed this alert. The agents searched the medium-sized bag pursuant to a warrant and found 1,000 grams of cocaine. Sokolow was indicted for possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). The district court denied his motion to suppress all statements and evidence secured pursuant to his seizure, his arrest, and the search of his luggage. Sokolow entered a conditional guilty plea under Fed.R.Crim.P. 11(a)(2), thereby preserving his right to challenge the district judge's ruling on his Fourth Amendment claims. Concluding that reversal was a possibility because the case was a "close one," the district court granted Sokolow bail pending appeal.

## II.

### A.

Resolution of the Fourth Amendment issues presented by this appeal requires a close analysis of the DEA agents' actions in detaining Sokolow and detaining and searching his luggage. We begin with the initial contact between the agents and Sokolow at curbside. Without making any specific findings of fact, the district court originally ruled that the initial contact between the agents and Sokolow at curbside did not rise to the level of a seizure, citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), for the proposition that

"[t]here is no Constitutional infringement when an officer merely approaches and speaks to an individual in a public place." *Id.* at 497, 103 S.Ct. at 1324. However, this ruling has since been cast into considerable doubt by the district court's findings on remand,[2] which belie the apparent assumption that this case involved nothing more than agents who approached and spoke to a suspect in a consensual manner. On remand, the district court accepted Sokolow's contention that the agents grabbed him by the arm and moved him back to a seat before they asked him questions. Although the "federal agents do not remember the event in the same way," the district court found that the government had not met its burden of proof on the issue.

■ We review de novo the question whether a seizure occurred. *See LaDuke v. Nelson*, 762 F.2d 1318, 1327 (9th Cir. 1985). Although we certainly have no quarrel with the proposition that police do not seize a person within the meaning of the Fourth Amendment by merely approaching him and asking him questions in public, we think it clear that the initial curbside contact in this case did not involve such a consensual encounter. Physically grabbing, moving, and seating a suspect to ask questions, even in public, clearly restrains that suspect's liberty in a nonvoluntary way. Indeed, the use of physical means to restrain a person's movement is the most obvious form of seizure. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968); *United States v. Mendenhall*, 446 U.S. 544, 553–54, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *United States v. Patino*, 649 F.2d 724, 728 (9th Cir.1981) (stating that physical restraint is the "most obvious" form of seizure). Thus, we hold that Sokolow was seized at the point he was grabbed and seated, and before any questioning occurred.

---

**2.** After argument, we vacated submission and remanded to the district court for additional findings of fact on specified issues.

## B.

Although not all seizures require probable cause, "any curtailment of a person's liberty by the police must be supported by at least a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam). We review the district court's conclusion that a reasonable suspicion existed de novo.[3] *United States v. Sutton,* 794 F.2d 1415, 1425 (9th Cir.1986); *United States v. Maybusher,* 735 F.2d 366, 371 & n. 1 (9th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1985). We conclude that no reasonable and articulable suspicion existed at the time the agents grabbed Sokolow by the arm and sat him down.

The agents knew the following facts matching their "drug courier profile" when they first approached Sokolow:[4] (1) that Sokolow had just returned from a three-day trip to Miami, a well-known source city for drugs; (2) that Sokolow had paid for his tickets out of a large wad of $20 bills; (3) that neither Sokolow nor Norian checked

any luggage; (4) that during Sokolow's layover in Los Angeles he "appeared to be very nervous and was looking all around the waiting area";[5] (5) that Sokolow dressed in a black jumpsuit and wore a lot of gold jewelry; and (6) that Sokolow had his voice on an answering machine at a phone subscribed to by Karl Herman but was ticketed under the name Andrew Kray. The agents did not know at the time of seizure that the defendant's true name was Sokolow. With these facts in mind, we begin our analysis.

## III.

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1967), the Supreme Court announced that brief stop and frisk detentions fell within the Fourth Amendment's protection against unreasonable searches and seizures. Since *Terry,* the courts have been left to explore "the limitations which the Fourth Amendment places upon a protective seizure and search for weapons" and to examine the broader limits of *Terry* as applied to situations beyond a police officer's need for self-protection. The increasing breadth of *Terry* issues[6]

---

**3.** We accept as not clearly erroneous the findings of fact upon which the district court based its conclusion that reasonable suspicion existed.

**4.** The district court based its conclusion that the initial curbside stop was supported by a founded suspicion in part on the facts that Sokolow admitted he was not traveling under his real name and that he told the agents he did not have his ticket even though he had just gotten off the plane. We disagree. The initial seizure, which we hold occurred when the agents first grabbed Sokolow, must be based upon a reasonable and articulable suspicion that existed at that time. It cannot be based on information that is a fruit of the seizure itself. *See United States v. Erwin,* 803 F.2d 1505, 1510 n. 2 (9th Cir.1986).

**5.** In our original opinion, we held that a report that simply characterized Sokolow's behavior during his layover in Los Angeles as "suspicious" was too conclusory to constitute *articulable* information supporting a reasonable suspicion absent any description of that "suspicious" behavior. 808 F.2d at 1370 n. 6. However, in its petition for rehearing, the government for the first time called our attention to testimony at the remand hearing that describes Sokolow's behavior in Los Angeles in greater detail. *See*

Gov't Pet. for Reh'g at 7 & n. 3, 13–14. The record now before us thus includes a report that Sokolow "appeared to be very nervous and was looking all around the waiting area" during his layover in Los Angeles. Tr. at 20, 36, 67. This report is articulated sufficiently to be considered as a basis for reasonable suspicion.

**6.** The range of issues addressed by the Supreme Court via a *Terry*-type analysis has broadened greatly. *See, e.g., United States v. Montoya de Hernandez,* 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985) (border search); *New Jersey v. T.L.O.,* 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (search of high school student by school officials); *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (search of car interior for weapons incident to an investigative stop); *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (*Terry* stop of luggage in airport); *Michigan v. Summers,* 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) (detention of person incident to the execution of a search warrant); *United States v. Cortez,* 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) (investigative stop of truck near border); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (temporary seizure to investigate potential violation of immigration laws); *Adams v.*

and the increasing difficulty of the courts in defining the limits of *Terry* stops "in the concrete factual circumstances of individual cases", 392 U.S. at 29, 88 S.Ct. at 1884,[7] demand that we pay heed to Justice Douglas's warning in dissent to *Terry* against the "powerful hydraulic pressures throughout our history that bear heavily ... to water down constitutional guarantees and give the police the upper hand." 392 U.S. at 39, 88 S.Ct. at 1889 (Douglas, J., dissenting). Believing that the government's position in its petition for rehearing unwittingly equates evidence of *behavior that a criminal may engage in* with *behavior indicating an ongoing crime,* and thus significantly dilutes our constitutional guarantees, we reaffirm our original conclusion that the Fourth Amendment was violated.

■ In assessing whether a given set of facts constitutes reasonable suspicion, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. "[T]he totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *see also United States v. Ramirez-Cifuentes,* 682 F.2d 337, 342 (9th Cir.1982).

■ Although the government may present a lengthy list of detailed observations, the courts are not relieved of their duty to review the list critically and decide whether each particular observation cited actually contributes something to the "whole picture"—that is, whether the particular observation bears any reasonable correlation to a suspicion that the person presently is engaged in criminal activity. *See Erwin,* 803 F.2d at 1510 n. 2 (refusing to consider facts "bear[ing] no reasonable relationship to the question of whether [the

suspect] was then engaged in the unlawful transportation of narcotics."). Courts are not obliged to accept blindly any fact the police can muster when the government fails to establish any credible connection between that fact and a suspicion of ongoing (or recently completed) criminal activity. Nor is the phrase "drug courier profile" a talismanic label that the government can apply to any given set of facts to obviate consideration of whether reasonable suspicion existed. Indeed, it is obvious that the "drug-courier profile" often has a chameleon-like way of adapting to any particular set of observations. *Compare, e.g., United States v. Moore,* 675 F.2d 802, 803 (6th Cir.1982) (suspect was first to deplane), *with United States v. Mendenhall,* 446 U.S. 544, 564, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980) (last to deplane), *with United States v. Buenaventura-Ariza,* 615 F.2d 29, 31 (2d Cir.1980) (deplaned from middle); *United States v. Sullivan,* 625 F.2d 9, 12 (4th Cir.1980) (one-way tickets), *with United States v. Craemer,* 555 F.2d 594, 595 (6th Cir.1977) (round-trip tickets); *United States v. McCaleb,* 552 F.2d 717, 720 (6th Cir.1977) (non-stop flight), *with Sokolow,* 808 F.2d at 1370 (changed planes); *Craemer,* 555 F.2d at 595 (no luggage), *with United States v. Sanford,* 658 F.2d 342, 343 (5th Cir. Unit B 1981) (gym bag), *with United States v. Price,* 599 F.2d 494, 500 (2d Cir.1979) (two carry-on and two-checked pieces of luggage); *United States v. Smith,* 574 F.2d 882, 883 (6th Cir.1978) (traveling alone), *with United States v. Fry,* 622 F.2d 1218, 1219 (5th Cir.1980) (traveling with companion). *See generally* Becton, *The Drug Courier Profile,* 65 N.C.L.Rev. 417, 438–44, 474–80 (1987).

■ What, then, may constitute reasonable suspicion to justify a seizure? We reaffirm our earlier conclusion that, even

*Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (investigative stop based upon informant's tip).

**7.** *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 560, 100 S.Ct. 1870, 1880, 64 L.Ed.2d 497 (1980) (Powell, J., concurring) (finding that "the question of whether the [defendant] could rea-

sonably have thought she was free to 'walk away' when asked by two Government agents for her driver's license and ticket is extremely close"); *United States v. Erwin,* 803 F.2d 1505, 1513 (Wiggins, J., dissenting) (noting that the courts "walk a fine line between rewarding good police judgment and authorizing arbitrary government action").

when one looks at the "whole picture," facts that bear some reasonable correlation to a suspicion of ongoing criminal activity but also " 'describe a very large category of presumably innocent travelers' " cannot support a reasonable suspicion by themselves. *See* 808 F.2d at 1371 (quoting *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754). Rather, such facts must be coupled with evidence about the "particular conduct" of the defendant, *Reid*, 448 U.S. at 441, 100 S.Ct. at 2754, and the "[p]articularized evidence must raise suspicions of *ongoing* (or recently completed) criminal activity." 808 F.2d at 1371. Simply put, the "whole picture" does not amount to reasonable suspicion unless such particularized evidence exists.

The "mosaic" presented by the government on petition for rehearing, even with the addition of evidence of Sokolow's nervousness in transit, fails to form an image of ongoing criminal activity. Instead, we see a vaguer shape resulting from the improper attempt to define not ongoing criminal activity but a class of people that is predominantly criminal. The Supreme Court, by contrast, requires that the reasonable suspicion supporting an investigative stop be reasonable suspicion of an ongoing crime, and thus forecloses the result requested by the government. We will support our conclusion with an analysis of *Terry* and its application to the use of criminal "profiles." We then discuss the development of *Terry* principles in profile-stop cases. We finally reaffirm our earlier conclusion that the profile in this case failed to provide reasonable suspicion for a seizure of Sokolow.

### A.

*Terry* concerned a policeman's stop of several persons the officer believed were "casing" a store for a robbery. The Court accepted that the officer had reasonable suspicion for a stop, and proceeded to discuss at greater length the reasonableness of his weapons frisk in light of his concern for his own safety from possible concealed weapons. 392 U.S. at 27–28, 88 S.Ct. at 1883; *see also id.* at 32–33, 88 S.Ct. at 1885 (Harlan, J., concurring). The Court concluded that the intrusion on the defendants' Fourth Amendment interests was warranted in light of the officer's need for safety.

The factual basis for the Court's brief conclusion is illustrative. The Court found that the defendants' behavior, when viewed through the trained eye of a police officer, was "consistent with [the officer's] hypothesis that these men were contemplating a daytime robbery." *Id.* at 28, 88 S.Ct. at 1883. It was not that Terry and his cohorts "looked like" robbers, but instead that their actions betrayed an involvement in a developing crime. This involvement justified the officer's investigative stop of the defendants, and the officer's reasonable concern for safety then warranted the weapons frisk.

■ The drug-courier profile, if used as a measure of reasonable suspicion, operates in a different manner than did the officer's trained evaluation that warranted the stop in *Terry*. Profile elements include aspects of a suspect's behavior that clearly are consistent with an ongoing crime, such as when a suspect uses an alias in travel or when a suspect takes an evasive or erratic path through an airport in a manner that demonstrates a desire to avoid detection. Traveling under an alias or evasive movements are part of the performance of the crime. These elements of the profile demonstrate behavior that, absent unusual circumstances,[8] reasonably may demonstrate an ongoing crime. An officer seeking to justify a seizure based upon these profile characteristics can testify to the suspicious behavior, and if the court finds the testimony credible, the seizure will be justified. The seizure is justified not because a requisite number of profile elements have been satisfied, but because some elements of the

---

**8.** In Judge Wiggins's dissent to *United States v. Erwin*, 803 F.2d 1505 (9th Cir.1986), he found plausible the defendant's explanation for actions deemed evasive by the majority. *Compare id.* at 1511 (majority finding roundabout route grounds for suspicion) *with id.* at 1512 (Wiggins, J., dissenting) (finding roundabout route failed to justify suspicion where defendant told agents that route was taken to avoid a picket line at a time when strike was in progress).

profile may create a reasonable suspicion of an ongoing criminal enterprise.

■ Other elements of the profile, however, seek to identify personal characteristics shared by drug couriers and the public at large, but which, when present in sufficient number, arguably serve to identify drug couriers. Such elements as nervousness, a destination or arrival including a "drug source" or "drug reception" city, manner of attire, time of flight, and position among the disembarking passengers, among myriad others, describe cross-sections of the people who use planes, but without any indication that those cross-sections are predominantly, or even mainly, engaged in an ongoing crime. By themselves, they indicate no ongoing criminal enterprise, but attempt to identify an individual as the type of person who may engage in a criminal enterprise, based upon stereotypes of drug courier appearance or behavior.

■ An officer attempting to justify a seizure based solely upon these aspects of the profile necessarily must present a different type of testimony than the factors discussed earlier. The officer must demonstrate that the combination of behavior exhibited by the suspect, although not directly probative of ongoing criminal behavior, is unlikely to exist in innocent persons or, perhaps, in some "significant" percentage of innocent persons.

Comparative examples may help. An officer in the first type of case will testify that, in accord with the sharpened understanding of his or her profession, a suspect's travel under an alias or meandering path through an airport demonstrate behavior indicative of an ongoing criminal activity. While probable cause for arrest does not yet exist, the most reasonable explanation of such activity may be that a criminal enterprise is in progress.

In this type of case, the traditional focus on criminal activity shifts to a focus on the personal characteristics of the individual under scrutiny. Not only is this transfer of focus impermissible, its accuracy is often uncorroborated. Here, an officer must testify that a pattern of behavior, otherwise explicable as innocent behavior, does not exist in a significant number of innocent people. The officer testifies not about his own trained observation of a criminal activity, but instead about the probability that drug couriers generally exhibit certain external characteristics. Unfortunately, the testimony seldom is constructed in that extended a fashion. Empirical documentation would be necessary for the assertion that, for example, the class of nervous, cash-paying travelers to Miami does not include significant numbers of innocent persons. The court is left to evaluate *not* the reasonableness of an officer's assessment of facts demonstrating an ongoing criminal enterprise, but the probabilistic evidence (compiled from cases not before the court) that indicates that "innocent" behavior is not so innocent.

We have already demonstrated, by reference to Judge Becton's painstaking and insightful examination of the profile, *see supra* p. 1418, the unusual vicissitudes that the profile may undergo in the hands of different agents and when justifying different seizures. The very transmutability of the profile demonstrates that it fails to justify a Fourth Amendment seizure. When the focus is away from facts indicating ongoing criminal activity and instead upon innocent behavior in which criminals may engage, virtually anything may support "reasonable" suspicion.

■ We do not believe that our conclusion destroys the mosaic by rejecting tile after tile. We merely recognize that the mosaic that may cause a trained officer of the law to investigate further is not the same mosaic that creates reasonable suspicion to allow a Fourth Amendment seizure. Some distinction between investigation and detention must remain.[9] The surmises or

---

9. Of course, the officer may approach the suspect prior to "reasonable suspicion," so long as his approach does not constitute a seizure. *See Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct.

308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam); *United States v. Mendenhall,* 446 U.S. 544, 553–55, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). We have already

hunches that may lead a trained investigator to continue investigation, however, do not serve to allow a seizure.

Our formulation of the reasonable suspicion standard also allows for the continued use of the profile in justifying reasonable suspicion. Accumulating a certain number of positive responses to elements of the profile would not create reasonable suspicion. Profile elements that indicate ongoing criminal behavior, however, may be supplemented by other aspects of the profile that would not by themselves create reasonable suspicion. Hence, a traveler under an alias arriving from Miami may arouse a greater suspicion than a traveler arriving under an alias from Dubuque. All of these supporting factors, however, should be demonstrated by more statistical evidence than "common knowledge."

We thus believe that reasonable suspicion must be founded upon evidence of ongoing criminal behavior. Probabilistic evidence, absent more, is insufficient to create reasonable suspicion. Such evidence, when sufficiently documented, may serve to confirm or deny reasonable suspicion based upon evidence of ongoing criminal behavior. We further believe that this interpretation of reasonable suspicion is not new, but has been announced by the Supreme Court in its examinations of the profile.

### B.

We believe that our interpretation of the reasonable suspicion standard is in harmony with the Supreme Court's pronouncements regarding the profile. The Court has consistently looked beyond the profile to determine whether a reasonable suspicion exists of a criminal enterprise. Searches based solely on the personal characteristics of a suspect have been rejected as unreasonable.

The Supreme Court first encountered the profile in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497

determined, however, that the agents seized Sokolow when they grabbed and forcibly seated

(1980). In *Mendenhall,* the defendant challenged her conviction on the ground that the evidence against her was obtained via an unconstitutional search and seizure. A majority of the court rejected the defendant's claim, although disagreed as to a rationale. Justice Stewart, joined by Justice Rehnquist, concluded that the stop of Mendenhall was consensual and thus did not amount to a seizure within the meaning of the Fourth Amendment. *Id.* at 553–55, 100 S.Ct. at 1876–77 (opinion of Stewart, J.). Justice Powell, joined by Chief Justice Burger and Justice Blackmun, found that, assuming that the initial questioning of the defendant was a seizure, the seizure was justified by reasonable suspicion. *Id.* at 560, 100 S.Ct. at 1880. Justice Powell did not reach the question of the initial seizure since the lower courts had not addressed the issue. *Id.* Four justices dissented.

Although Justice Stewart noted that the initial confrontation was based upon the "so-called 'drug courier profile'—an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs," *id.* at 547 n. 1, 100 S.Ct. at 1873 n. 1, his opinion did not discuss the profile since he deemed the initial encounter to be consensual. Only Justice Powell's concurrence reached the issue, and his analysis is significant. In recounting the events that created reasonable suspicion, Justice Powell noted that the "respondent, who appeared very nervous, *engaged in behavior that the agents believed was designed to evade detection." Id.* at 564, 100 S.Ct. at 1882 (opinion of Powell, J.). Although Justice Powell spoke for only three members of the court, his analysis clearly was predicated upon ongoing criminal behavior. The dissent took issue with Justice Powell that the evidence was sufficient to establish reasonable suspicion of ongoing criminal behavior, but all seven justices who reached the issue agreed that the agents must have reasonably suspected that the defendant was "engaged in criminal activity." *Compare id.* (Powell, J., concurring)

him at the airport curb.

*with id.* at 571, 100 S.Ct. at 1886 (White, J., dissenting).

The court again considered the drug-courier profile later in the 1979 Term. In *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam), the Court vacated a decision of the Georgia Court of Appeals. The Georgia court had found reasonable suspicion for a seizure based upon a number of characteristics within the courier profile. In vacating, the Court noted that

> [o]f the evidence relied on, only the fact that petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct. The other circumstances [drug source city departure, early-morning arrival, no luggage other than shoulder bags] describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure.

*Id.* at 441, 100 S.Ct. at 2754. Once again, then, the court rejected a definition of reasonable suspicion not predicated on ongoing criminal activity. Particular conduct of an ongoing criminal enterprise is required; evidence regarding the type of person suspected does not suffice.

*Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), also presented an investigation premised on the "so-called 'drug courier profile.' " *Id.* at 493, 103 S.Ct. at 1322 (opinion of White, J.). In *Royer*, the defendant contested a search obtained after a stop occasioned by the profile. The plurality, per Justice White, found that the initial stop of Royer was justified by a reasonable suspicion, but that the subsequent movement of Royer to a small room exceeded the permissible level of the investigative stop. *Id.* at 502–05, 103 S.Ct. at 1326–28. Both dissenting opinions agreed that the initial stop was justified by a reasonable suspicion. *See id.* at 518, 103 S.Ct. at 1335 (Blackmun, J., dissenting); *id.* at 523, 103 S.Ct. at 1337 (Rehnquist, J., dissenting). Thus, all the members of the Court, save Justice Brennan, *see id.* at 509, 103 S.Ct. at 1330 (Brennan, J., concurring in the result), agreed that a reasonable suspicion existed.

The facts leading up to the detention of Royer are far different than those at hand here, and *Royer* quite simply cannot serve as a simple equation of the drug-courier profile with reasonable suspicion. Royer was not seized (as was Sokolow) when initially approached, and therefore the officers properly discovered that he was traveling under an alias, since the name they observed on his luggage was different that the name on his license and ticket. It was this indication of ongoing criminal activity, and not the factors of the profile noted by the Court, *see id.* at 493 n. 2, 103 S.Ct. at 1322 n. 2 (opinion of White, J.), that justified the stop. As the plurality noted,

> when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers—paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general—were adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions in a way that did not exceed the limits of an investigative detention.

*Id.* at 502, 103 S.Ct. at 1326 (opinion of White, J.). Only once the evidence of ongoing criminal activity (traveling under an alias) was established, did other factors, such as payment in cash, become relevant to support or controvert the reasonableness of the officers' suspicion.

 In this case, as opposed to *Royer*, there was no evidence of ongoing criminal activity, specifically the use of an alias. The fact that Sokolow's voice was on an answering machine for a phone listed under the name of his roommate Karl Herman does not provide a basis for suspecting that Sokolow was using an alias. In contemporary society it is not unusual for persons with different last names to share a common residence and telephone. Nor is it unusual for a member of the same house-

hold to dictate prerecorded messages on the answering machine even though his or her name is not listed with the phone company as the subscriber. Thus the fact that a discrepancy existed between the name that Sokolow gave to the airline and the name under which his phone was listed is not evidence of an alias—a legitimate indicator of ongoing criminal activity. It was only when Sokolow stated that his true name was Sokolow but that he was travelling under his mother's maiden name of Kray that the agents had a valid reason to believe that Sokolow was travelling under an assumed name. That, however, occurred *after* the seizure. In sum, the agents' belief before the seizure that Sokolow was travelling under an alias was unwarranted and cannot be used as a ground for bringing this case in line with *Royer*. In the absence of this evidence of alias, or some other evidence of an ongoing criminal activity, the agents' seizure of Sokolow cannot be justified.

Judge Becton identifies a final Supreme Court drug-courier profile case in *Florida v. Rodriguez*, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam). *See* Becton, *supra*, at 422. Although the case does not mention the profile, the type of stop and its justification suggest the profile in operation. In any event, the case does not represent a change in the requirement of evidence of ongoing criminal activity. The court noted that, prior to the stop, the defendants engaged in evasive behavior and made contradictory statements regarding their knowledge of each other. *Rodriguez*, 469 U.S. at 6, 105 S.Ct. at 311. Such behavior is consonant with an ongoing criminal enterprise.

In summary, the Court consistently has required that an officer's suspicion be supported by evidence of ongoing criminal activity. Such behavior cannot be intuited from a hodgepodge assembly of "factors" about individual character rather than criminal acts. It must demonstrate the ongoing commission of a crime. The list of such actions would be extensive. Evasion

and traveling under an alias are among the most common. Until such evidence of an ongoing crime is developed, however, other factors are irrelevant to reasonable suspicion. Once evidence of ongoing criminal behavior is produced, then other factors may confirm or contradict the reasonableness of suspicion, but other factors may not alone support a stop.

C.

We are left to apply our interpretation to the seizure of Sokolow at the curbside of the Honolulu airport. The six factors proffered by the government fail to indicate an ongoing criminal enterprise. The government suggests that Sokolow's nervousness while awaiting a connecting flight in Los Angeles, when considered in the context of the other evidence, presented a reasonable suspicion of ongoing criminal activity. There is no evidence on the record to indicate that Sokolow's nervousness was indicative of an attempt to evade detection. *Cf. Mendenhall*, 446 U.S. at 564, 100 S.Ct. at 1882 (opinion of Powell, J.) ("[T]he respondent, who appeared very nervous, engaged in behavior that the agents believed was designed to evade detection.")[10] Nervousness would appear to be a normal human reaction to air travel today, with the seemingly growing risk of mid-air collision and the near certainty of delays that may interrupt the plans of travelers. *See generally Year of the Near Miss*, Newsweek, July 27, 1987, at 20. We thus find nothing in the evidence discovered by the government that would create a reasonable suspicion that Sokolow was engaged in an ongoing criminal enterprise.

The government assures us that "[t]he combination of facts in this case will rarely, if ever, describe an innocent traveler." Gov't Pet. for Reh'g at 13. The obvious lack of substantiation for this claim betrays its lack of merit. That courts have ultimately found no Fourth Amendment violation in cases that mention these factors can

---

**10.** That the plurality in *Royer* mentioned nervousness as part of the profile, 460 U.S. at 493 n. 2, 103 S.Ct. at 1322 n. 2, cannot be considered

an acceptance that nervousness creates reasonable suspicion.

hardly serve to confirm these factors as justification for searches and seizures. In sum, the vague and inchoate profile presented here best serves as an investigative tool. *See* Becton, *supra,* at 471 ("[C]ourts should consider the profile as 'nothing more than an administrative tool of the police.' ") (quoting *United States v. Berry,* 670 F.2d 583, 600 (5th Cir. Unit B 1982)). It is hazy in form, susceptible to great adaptations, and almost entirely speculative. It may generate good police work, but absent more, it certainly would generate bad law.

## CONCLUSION

Since we do not believe that the government has demonstrated that it had a reasonable suspicion that Sokolow was engaged in criminal activity, we reverse the district court and order suppression of the evidence illegally seized. We therefore do not reach questions related to the acts subsequent to Sokolow's curbside detention.

REVERSED and REMANDED.

WIGGINS, Circuit Judge, dissenting:

If the present opinion becomes the law of this circuit, I conclude that many, and perhaps all, *Terry* stops that rely upon drug courier profile characteristics may fail on constitutional grounds. Because I believe such an unfortunate result is not mandated by the law, I respectfully dissent.

The fourth amendment prohibits unreasonable searches and seizures. Courts determine the reasonableness of a search or seizure by "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Ct.,* 387 U.S. 523, 536–37, 87 S.Ct. 1727, 1734–35, 18 L.Ed.2d 930 (1967). In determining whether a particular search or seizure is reasonable, the Supreme Court has developed a three-tier structure of fourth amendment jurisprudence. The first category includes consensual police-citizen encounters, such as brief stops for questioning. Here no seizure occurs and the fourth amendment is not implicated. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983); *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The second level consists of brief investigative detentions and pat downs of outer clothing. Because these intrusions are "seizures," law enforcement officials must have a reasonable, articulable suspicion that the suspect has recently committed a crime or is about to commit one. *See Terry,* 392 U.S. at 21, 88 S.Ct. at 1879; *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972). The third category comprises full-scale searches or arrests requiring probable cause. *See Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).

I agree with the majority that a fourth amendment seizure occurred in this case when the DEA agents approached defendant Sokolow at the curbside. A person is seized when his freedom of movement is restrained by means of physical force or a show of authority. *See United States v. Mendenhall,* 446 U.S. 544, 553, 100 S.Ct. 1870, 1876, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *Terry,* 392 U.S. at 16, 88 S.Ct. at 1877 n. 16. The DEA agents grabbed Sokolow by the arm, moved him away from the curb, and seated him before they began questioning. I also agree that this initial seizure was not sufficiently intrusive to constitute a full-scale arrest. The DEA momentarily detained Sokolow for questioning in an attempt to dispel their suspicions, exactly the type of behavior approved by the Court in *Terry.* 392 U.S. at 22–23, 88 S.Ct. at 1880–81. Although difficult line-drawing problems may arise in distinguishing an investigative stop from a de facto arrest, the seizure of Sokolow at curbside does not raise such a problem. The detention was brief, served the important law enforcement purpose of detecting drug couriers, and lasted no more than necessary to effectuate this purpose. *See United States v. Sharpe,* 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985) (in distinguishing investigative stop from de facto arrest, court should consider brevity of stop, law enforcement purposes served, and time reasonably needed to effectuate those purposes).

The detention here was a second-tier, or *Terry* seizure and thus we determine its constitutionality by the reasonable articulable suspicion standard. The majority concludes that the agents did not possess this level of suspicion. This conclusion rests upon an unjustified parsing of the drug courier profile. The majority divides the profile into two types of elements: first, those that the majority views as "consistent with an ongoing crime," such as the use of an alias or taking an erratic path through an airport, and second, elements that seek to identify personal characteristics shared by drug couriers. The majority finds that regardless of the number of the second type of factors possessed by a suspect, the DEA cannot make any type of "seizure" unless the suspect exhibits a behavior that the majority terms "evidence of ongoing criminal behavior." According to this view, drug courier profile characteristics may not *ever* support reasonable suspicion in themselves, and can only be used to confirm or deny suspicion based on other factors.

I believe that the majority's approach seriously undermines the effectiveness of the drug courier profile as an investigative tool. The DEA developed the drug courier profile in the early 1970's as part of an effort to combat escalating drug smuggling through this nation's airways. The profile consists of a number of characteristics, all of which, both singly and collectively, are in themselves lawful. The DEA has determined, however, based upon its collective experience, that certain characteristics are commonly associated with drug couriers.[1] Specially trained and experienced DEA agents use this profile to identify suspected drug traffickers and their efforts have met with some success. *See Mendenhall*, 446 U.S. at 562, 100 S.Ct. at 1881 (Powell, J., concurring) (during first eighteen months of profile program, DEA agents in Detroit searched 141 persons in 96 encounters, found controlled substances in 77 of these encounters, and arrested 122 persons).

Because conformance with some aspects of the profile could "describe a very large category of presumably innocent travelers," *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1981), the profile is not intended to provide a mathematical formula for establishing reasonable suspicion. But neither should DEA agents be completely precluded from stopping potential drug couriers for questioning based on profile characteristics. *See United States v. Berry*, 670 F.2d 583, 601 (5th Cir.1982) (en banc) (match with some profile characteristics does not automatically support reasonable suspicion but the fact that characteristic appears on profile doesn't preclude its use as a justification for a stop); *United States v. Price*, 599 F.2d 494, 502 n. 10 (2d Cir.1979) (appropriate for reviewing court to take profile into account as it represents a "kind of institutional expertness"); *United States v. McCaleb*, 552 F.2d 717, 720 (6th Cir.1977) (set of facts may arise in which existence of profile characteristics constitutes reasonable suspicion although facts not sufficient in this case). The determination of reasonable suspicion must turn on the facts of each case. In other words, "the totality of the circumstances—the whole picture—must be taken into account." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

**1.** The specific elements of the profile vary among airports, in accordance with the experience of DEA agents at a particular location. The original profile, developed in Detroit by DEA Special Agent Paul Markonni consists of seven "primary characteristics" and four "secondary characteristics." The primary characteristics are: 1) arrival from or departure to an identified source city; 2) carrying little or no luggage; 3) traveling by an unusual itinerary; 4) use of an alias; 5) carrying unusually large amounts of currency; 6) buying airline tickets with a large amount of small denomination currency; and 7) unusual nervousness. The secondary characteristics are: 1) the almost exclusive use of public transportation; 2) immediately making a telephone call after deplaning; 3) leaving a false call back number with the airline; and 4) excessive travel to source or distribution cities. *See* Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas*, 65 B.U.L.Rev. 843, 871 n. 120 (1985) (citing *United States v. Elmore*, 595 F.2d 1036, 1039 n. 3 (5th Cir.1979); *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980)).

In evaluating the whole picture, a trained officer may draw inferences and make deductions that would escape an untrained observer. *Id.* at 418, 101 S.Ct. at 695. Conduct seemingly innocent may, viewed as a whole, appear suspect to one familiar with the practices of drug smugglers and the methods used to avoid detection. *See Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979); *United States v. Wallraff*, 705 F.2d 980, 988 (8th Cir.1983); *United States v. Ramirez-Cifuentes*, 682 F.2d 337, 342 (2d Cir. 1982). Moreover, this process "does not deal with hard certainties, but with probabilities," *Cortez*, 449 U.S. at 418, 101 S.Ct. at 695, and does not lend itself to bright-line rules. Where experience shows that certain characteristics are repeatedly found among drug smugglers, "sheer logic dictates that ... the existence of those characteristics in a particular case is to be considered" in the reasonable suspicion equation. *Royer*, 460 U.S. at 526–27 n. 6, 103 S.Ct. at 1339 n. 6 (Rehnquist, J., dissenting). The majority's approach, therefore, is overly mechanistic because conformity with a drug-courier profile could *never*, by itself, justify an investigative detention. This result is contrary to the case-by-case determination of reasonable articulable suspicion based on *all* the facts that the Supreme Court has espoused in *Terry* and subsequent cases.

The majority contends that its mechanical view of the reasonable suspicion standard is "in harmony" with Supreme Court cases discussing the drug courier profile. This reading of the Supreme Court cases is unjustified. Although the Court has not delineated any explicit guidelines, it has approved the use of drug courier profile characteristics to support investigative stops. The Supreme Court first discussed the profile in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). A majority of the Court found that the stop of the defendant was constitutional, but could not agree as to a rationale. Justice Stewart, joined by Justice Rehnquist, found that no seizure occurred when the defendant was approached by agents in the airport concourse, and so did not reach

the issue of whether the drug courier profile could provide reasonable suspicion. *Id.* at 557, 100 S.Ct. at 1878 (opinion of Stewart, J.)

Justice Powell's concurring opinion, joined by Chief Justice Burger and Justice Blackmun, assumed that the initial encounter constituted a seizure, but found that it was justified by reasonable suspicion. This finding was based on the fact that Mendenhall met the following profile characteristics: 1) she arrived in Detroit from Los Angeles, a source city, 2) she appeared nervous, "engaged in behavior that the agents believed was designed to evade detection," 3) she was the last to deplane, 4) she claimed no luggage, and 5) she changed airlines for her flight out of Detroit. *Id.* at 564, 100 S.Ct. at 1882 (Powell, J., concurring). Justice Powell emphasized that the agents were specially trained, and indicated that defendant's ostensibly innocent conduct could have had an entirely different meaning for the trained observer. *Id.* at 563–64, 100 S.Ct. at 1882. The majority here seizes on Justice Powell's comment that respondent "engaged in behavior ... designed to evade detection" to support a legal conclusion that reasonable suspicion *always* requires evidence of ongoing criminal activity. Justice Powell expressly refuted this formalistic reading of the reasonable suspicion standard. Although he did not maintain that the drug courier profile *automatically* demonstrated reasonable suspicion, he noted that "[e]ach case raising a Fourth Amendment issue must be judged on its own facts." *Id.* at 565 n. 6, 100 S.Ct. at 1883 n. 6.

The Supreme Court again considered the constitutionality of airport drug stops in *Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam). The Court found that the DEA agents could not have reasonably suspected Reid of criminal activity based on the few profile characteristics observed. The agents knew only that: 1) Reid had arrived from Fort Lauderdale, 2) he arrived in the early morning, 3) he and his companion tried to conceal the fact that they were traveling together, and 4) they had no luggage other

than shoulder bags. *Id.* at 441, 100 S.Ct. at 2754. Although the Court noted that three of these factors described a "very large category of innocent travelers," the court did not wholly reject reliance on the drug courier profile when more or different factors are present. While conformity with certain aspects of the profile does not automatically create reasonable suspicion, "there could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *Id.; see also United States v. Erwin,* 803 F.2d 1505, 1511 (9th Cir.1986) (*Reid* does not preclude all reliance on profile characteristics; it simply indicates that most general characteristics cannot alone support a stop).

Subsequently, in *Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), eight members of the Court found reasonable suspicion based on drug courier profile characteristics. The plurality held that the agents possessed sufficient suspicion for an investigative stop, but that the agents exceeded the permissible bounds of the stop when they moved Royer to a small room for questioning. *Id.* at 502–05, 103 S.Ct. at 1326–28 (opinion of White, J.). Both dissenting opinions agreed that the agents had reasonable suspicion for the initial detention. *See id.* at 518, 103 S.Ct. at 1335 (Blackmun, J., dissenting); *id.* at 524–25, 103 S.Ct. at 1338 (Rehnquist, J., dissenting).

The plurality relied on the following facts to support its finding of reasonable suspicion: 1) Royer was traveling under an assumed name, 2) he paid cash for a one-way ticket, 3) he wrote only a name and destination on his baggage identification tags, and 4) his general appearance and conduct were unusual. *Id.* at 502, 103 S.Ct. at 1326 (opinion of White, J.). Although Justice White did not explicitly rely on the drug courier profile, all the characteristics he mentioned are commonly included. *See id.* at 493 n. 2, 103 S.Ct. at 1322 n. 2 (listing characteristics considered by DEA agents to be within the profile).

The majority in the present case contends that Royer's use of an alias was the requisite evidence of ongoing criminal activity that justified the stop; the other factors were then only relevant once the alias was discovered. This gloss on Justice White's opinion is wholly unsupportable. Justice White referred to the use of an alias in the reasonable suspicion equation, but he in no way suggested that the alias is the central or absolutely necessary factor that makes all the other factors relevant. Moreover, Justice White expressly rejected the view of the Florida District Court of Appeals that "a mere similarity with the contents of the drug courier profile is insufficient even to constitute ... articulable suspicion." *Id.* at 495 n. 7, 103 S.Ct. at 1323 n. 7.

I conclude, therefore, that a fair reading of Supreme Court precedent is that conformity with drug courier profile characteristics does not automatically provide reasonable suspicion, but can justify an investigative stop in a particular case. The fourth amendment requires a case-by-case determination, and on the facts of the case before us the DEA agents possessed reasonable and articulable suspicion that Sokolow was engaged in narcotics trafficking. The agents knew the following facts when they initially approached Sokolow at the airport curbside: 1) Sokolow had just returned to Hawaii from a three-day trip to Miami, a well known source city for drugs, 2) Sokolow paid for his ticket with cash from a large roll of twenty dollar bills, 3) neither Sokolow nor his companion checked any luggage, 4) Sokolow appeared very nervous and looked all around the waiting area during his layover, and 5) Sokolow used the name Andrew Kray on his airline tickets, but his voice was on an answering machine at a phone subscribed to by Karl Herman.

Viewed collectively, these articulable facts were sufficiently suspicious to justify a brief and minimally intrusive investigative detention. Of particular importance is the fact that Sokolow paid $2100 for his tickets from a stack of twenty dollar bills approximately double that amount. Innocent persons do not characteristically carry thousands of dollars in twenty dollar bills on their persons. Certainly, this cash pay-

ment was inconsistent with a legitimate business trip; Sokolow left no paper trail for reimbursement for his expenses or for tax deductions.

Further, Sokolow's travel pattern belies any assumption that he traveled to Miami for a pleasure trip. He flew from Honolulu to Miami, a well known drug source city, on July 22 and returned on July 25, a very short time considering that it takes a minimum of ten hours to travel each way. Also, neither Sokolow nor his companion checked any luggage. These relatively anomalous characteristics enhance the suspicious circumstances of the large cash purchase of the tickets.

Finally, Sokolow was nervous during his layover in Los Angeles and glanced all around the waiting area, hardly a sign of an innocent traveler. The Supreme Court has recognized that nervousness can contribute to the reasonable suspicion calculation. *See Royer,* 460 U.S. at 493 n. 2, 103 S.Ct. at 1322 n. 2 (opinion of White, J.); *Mendenhall,* 446 U.S. at 564, 100 S.Ct. at 1882 (opinion of Powell, J.); *see also Erwin,* 803 F.2d at 1511. The majority dismisses this evidence of nervousness because the record does not explicitly state that Sokolow's nervousness was indicative of an attempt to evade detection. I find no merit in this distinction. Sokolow's nervousness was certainly suspicious and was one of many relevant factors to be considered in determining whether the stop was justified.

In *Erwin,* this court concluded that arrival from a drug source city after a one day stay with only carry on luggage required further particularized evidence to establish founded suspicion. The *Erwin* court concluded that defendant's nervous behavior, circuitous route through the airport, and possible effort to conceal the truth fulfilled the requirement of particularized evidence.

*Id.* at 1511. I submit that Sokolow's payment for his airline ticket in thousands of dollars in twenty dollar bills, coupled with his unusual travel pattern and nervous behavior are more objectively suspicious than the facts on which the *Erwin* court relied.[2]

My conclusion that Sokolow's seizure at curbside was supported by reasonable suspicion requires me to address Sokolow's additional arguments. Sokolow contends first, that investigative detention ripened into an arrest once he was moved to the DEA office, and second, that the retention of the three pieces of luggage the narcotics dog did not alert to exceeded the permissible limits of an investigative stop. I find that the detention of Sokolow and his luggage in the DEA office for the purpose of subjecting his luggage to a dog sniff was a permissible continuation of the investigative stop and did not constitute a de facto arrest.

The scope of a stop is reasonable if the officers' action is "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. When the facts support a rational and articulable basis to detain an individual, the mere fact that an individual is relocated does not transform the detention into an arrest. *See United States v. Chatman,* 573 F.2d 565, 567 (9th Cir.1977); *see also Royer,* 460 U.S. at 504–05, 103 S.Ct. at 1328 ("[t]here are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area.")

Even a valid detention can become excessive if it lasts longer or is more intrusive than necessary. *See Sharpe,* 470 U.S. at 687, 105 S.Ct. at 1576. Here, Sokolow and his luggage were relocated to the DEA

---

**2.** The *Erwin* court relied heavily on defendant's use of an allegedly circuitous route through the airport to distinguish itself from *Reid* where defendant's arrival in the early morning from a drug source city without checked luggage was held to be too generalized to constitutionally warrant a *Terry* stop. I dissented in *Erwin* because I disagreed with the majority that a circuitous route and possibly implausible expla-

nation were sufficient facts to distinguish *Erwin* from *Reid,* and because I believed the record did not support the court's conclusion that the defendant was "nervous" before he was detained. I take the opposite view here because I believe the agents' suspicions were reasonably backed by specific facts that would not apply wholesale to innocent persons. *Erwin,* 803 F.2d at 1511–13 (Wiggins, J., dissenting).

airport office simply because the narcotics detector dog was not allowed to examine luggage in a public area. The agents took only the minimally intrusive step of subjecting Sokolow's luggage to a dog sniff. *See United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (dog sniff is minimally intrusive and does not constitute a search within the meaning of the fourth amendment). And the narcotics dog alerted to the luggage only thirteen minutes after the initial encounter between Sokolow and the DEA agents. *See Sharpe*, 470 U.S. at 687, 105 S.Ct. at 1576 (upholding twenty minute detention where agent pursued his investigation in a diligent and reasonable manner); *cf. Place*, 462 U.S. at 709, 103 S.Ct. at 2645 (finding ninety minute detention excessive where agents knew of defendant's scheduled arrival and could have been more diligent in arranging investigation). The temporary relocation and brief detention were not, under the circumstances, so unreasonable as to constitute an impermissible de facto arrest.

Contrary to Sokolow's position, the decision in *Royer* does not dictate a different result. The Court found in *Royer* that the officers' conduct in removing Royer to a small, windowless room for interrogation was "more intrusive than necessary to effectuate an investigative detention ..." 460 U.S. at 504, 103 S.Ct. at 1328 (opinion of White, J.). First, the Court noted that the defendant was apparently relocated for no other reason than to obtain his consent to a search of his luggage. *Id.* at 505, 103 S.Ct. at 1328. Here, on the other hand, narcotics dogs were not allowed in the public areas of the airport and therefore important safety and security reasons justified the relocation. Second, the Court pointed out that the narcotics agents could feasibly have investigated the contents of Royer's bags in a more expeditious manner by using trained dogs. *Id.* at 505, 103 S.Ct. at 1328. This recommended investigative technique was exactly the one used in the instant case.

Once the narcotics dog alerted to the brown shoulder bag, the DEA agents had probable cause to arrest Sokolow. *See*

*Royer*, 460 U.S. at 506, 103 S.Ct. at 1329. The positive alert also provided probable cause to obtain a search warrant and to detain the bag pending issuance of the warrant. *See Place*, 462 U.S. at 701–02, 103 S.Ct. at 2641–42; *United States v. Martell*, 654 F.2d 1356, 1360 (9th Cir.1981), *cert. denied*, 463 U.S. 1213, 103 S.Ct. 3551, 77 L.Ed.2d 1397 (1983). Sokolow argues, however, that the agents impermissibly detained the three pieces of unalerted to luggage for an additional 170 minutes until the first bag was searched, exceeding the 90 minute detention the Court found unreasonable in *Place*. 462 U.S. at 709, 103 S.Ct. at 2645.

This case, unlike *Place*, did not involve an investigative detention, but rather the detention of a person's luggage as incident to his lawful arrest. Thus, the luggage detention did not implicate any of the fourth amendment interests discussed in *Place*. First, Sokolow's privacy interest in the *contents* of his luggage was not impaired by the agents simply holding his luggage. *Cf. id.* at 706–07, 103 S.Ct. at 2644. Second, Sokolow's liberty interest in proceeding with his trip was not implicated because he was restrained not by the detention of his luggage, but by his lawful arrest. *Cf. id.* at 708, 103 S.Ct. at 2645. And third, Sokolow had a possessory interest in his luggage. *Id.* But the agents could reasonably assume that an arrestee wants his property held in safekeeping, especially considering that Sokolow made no other request regarding the disposition of his luggage.

After the search of the shoulder bag yielded no apparent narcotics, the probable cause to hold Sokolow and his remaining luggage evaporated. The subsequent detention of the luggage for a second dog sniff, however, was justified by new grounds for reasonable suspicion that arose after the first dog sniff. The government contends that this suspicion existed on the basis of the following: 1) Sokolow had been identified as a cocaine customer, 2) Sokolow made a statement that he was in big trouble, 3) he possessed other used airline tickets to Miami and ho-

tel receipts under the name Kray, 4) he had other used airline tickets to Miami under yet a third name, 5) he kept a debit sheet consistent with drug records, and 6) he carried an address book containing the names and addresses of suspected drug traffickers. Under these circumstances, it was reasonable to detain the remaining luggage for 35 minutes to subject it to a second dog sniff. The dog's second alert constituted probable cause to detain the alerted to bag until the agents obtained a search warrant. The search pursuant to a valid warrant uncovered the over 1000 grams of cocaine that Sokolow seeks to suppress.

In sum, the majority's approach effectively throttles the efforts of drug enforcement agents to combat escalating narcotics trafficking. The fourth amendment protects against *unreasonable* searches and seizures. In my view, it is entirely reasonable for agents to detain and question a suspected drug courier briefly based upon a rational profile. Therefore, the district court did not err in refusing to suppress the over 1000 grams of cocaine seized from defendant Sokolow.